# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

WILLIAM A WHITE,                                  )
                                                 )
                        Plaintiff,               )
                                                 )
            v.                                   )        Case No. 1:22-cv-02405-TWP-TAB
                                                 )
ROBERT KENNETH DECKER,                           )
UNITED STATES OF AMERICA,                        )
FEDERAL BUREAU OF PRISONS,                       )
                                                 )
                        Defendants.              )

## ORDER ADDRESSING CROSS-MOTIONS FOR SUMMARY JUDGMENT, DENYING MOTION FOR SANCTIONS, AND DIRECTING FURTHER ACTIONS

Plaintiff William A. White ("White"), a federal inmate, initiated this action alleging nine distinct claims against the United States of America ("United States") and the Federal Bureau of Prisons ("BOP") (collectively, the "Federal Defendants") and two distinct claims against BOP inmate Robert Kenneth Decker ("Decker"). Presently pending before the Court are two motions regarding White's evidence and statement of facts (Dkts. 191, 192), numerous motions by White to strike evidence on the record (Dkts. 211, 213, 214, 217, 219, 220), and numerous motions for summary judgment filed both by White (Dkts. 189, 201) and the Federal Defendants (Dkt. 203].[1]

For the reasons below, White's motion for leave to file a separate statement of material facts, and motion to order defendants to file video, are **granted to the extent** that this order

---

[1] White has provided statements of facts in three different documents that total nearly 100 pages (Dkts. 189, 189-1, 190, 226). Further, his statement of facts merely rehashes the numerous discovery disputes between the parties and often fails to reference specific documentary evidence on the record. White requests the Court to either strike the Federal Defendants' brief in its entirety or accept all his statements as omitted for their failure to address his statements pursuant to the local rules. (Dkt. 226 at 2.) But White's failure to adhere to a concise statement of material facts and insistence on submitting voluminous filings do not warrant their automatic acceptance as factual. Further, striking the Federal Defendants' brief in its entirety is improper and unnecessary. The Court construes *pro se* filings liberally, and will construe the parties' facts pursuant to the summary judgment standard.

provides below. His numerous motions to strike evidence from the record are all **denied.** The Federal Defendants' motion for summary judgment is **granted in part and denied in part**. White's motion for summary judgment against the Federal Defendants is **denied,** and his motion for summary judgment against Decker is **granted in part and denied in part**

## I.  STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.    PENDING MOTIONS

As an initial matter, the Court will address the pending non-dispositive motions, before determining the factual background.

### A. Federal Defendants' Motion to Strike Plaintiff's Exhibit 1 (Dkt. 206 at 12)

The Federal Defendants incorporated within their motion for summary judgment an objection and motion to strike, White's Exhibit 1 (Dkt. 190 at 1-41), which consists of a psychological examination from a Dr. Richard M. Samuels ("Dr. Samuels"). (Dkt. 206 at 12). Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule requires "evidentiary relevance and reliability" of expert testimony, with the focus on "principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). "The district court acts as a 'gatekeeper' in determining the relevance and reliability of the opinion testimony and enjoys 'broad latitude' in

making such a determination." *United States v. Moshiri*, 858 F.3d 1077, 1083 (7th Cir. 2017) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

"[T]he district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). "[T]he key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at [his] opinion." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted).

The Federal Defendants argue that White's Exhibit 1 should be stricken because Dr. Samuels is not qualified to be an expert, the report is outdated, and this report is neither helpful nor based on sufficient facts related to the issues in this case. (Dkt. 206 at 12). In support of their argument, Federal Defendants note that the psychological evaluation was performed for another of White's cases in the Middle District of Florida, Cause No. 6:14-cv-00936-JSS-RMN, and they argue the findings within the report are dated. However, the report has an 'Initial Study Concluded' date of August 14, 2019, and a "Final Update Concluded" date of November 5, 2024, making the report salient and timely for the facts of this case.

As to the first step, the Court finds the Federal Defendants' argument unconvincing. Dr. Samuels is a trained psychologist who had been licensed at one time in two different states, giving him general expertise regarding the issue of standard of care for White's mental health needs. (Dkt. 190 at 31). He need not be a specialist in Indiana or hold active registration as a psychologist to render his report useful. "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200

F.3d 1092, 1098 (7th Cir. 2000). The Court finds that Dr. Samuels is sufficiently qualified for the Court to consider his testimony and report regarding White's medical diagnoses and previous medical care.

Under the second step, "the court must determine whether the expert's testimony reflects scientific knowledge; that is, the court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Daubert*, 509 U.S. at 592–93). "*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community." *C.W.*, 807 F.3d at 835.

"Ultimately, there are many different kinds of experts, and many different kinds of expertise. The test of reliability, therefore, is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Gopalratnam*, 877 F.3d at 780. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. Fed. R. Evid. 702; Advisory Committee's Notes to 1972 Proposed Rule 702; *United States v. Navarro*, 90 F.3d 1245, 1261 (7th Cir. 1996). "The principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Dr. Samuels's medical opinion is not based on 'junk science', but almost fifty years of medical experience. (Dkt. 190 at 31). The Federal Defendants point out that Dr. Samuels is not registered with the American Board of Psychology, however, both the Middle District of Florida

and Middle District of Pennsylvania accepted Dr. Samuels's testimony and ruled him qualified to provide an expert opinion. That is sufficient here. Dr. Samuels has established that he has specialized knowledge as required by Rule 702.

Due to his specific knowledge of the circumstances and experience in the field, Dr. Samuels's testimony and report will assist the Court in understanding the evidence and in determining the facts at issue in this case. Accordingly, the Federal Defendants' motion to strike Dr. Samuels's Report is **denied**. Dr. Samuels's testimony and evidence are considered for the purposes of the parties' cross-summary judgment motions.

### B. Motion for Leave to File Separate Statement of Material Facts (Dkt. 191)

White's motion to file a separate statement of material facts is **granted** to the following extent: White's document labeled as his statement of material facts at docket 189-1 is deemed as part of his motion for summary judgment filed at docket 189, and the Court considers that document in this Order.[2]

### C. Motion to Order Defendants to File Videos (Dkt. 192)

On April 16, 2025, White filed a motion to order defendants to file videos (Dkt. 192). White alleges that the BOP and United States had possession of specific videos identified as exhibits to his motion for summary judgment. White asks the BOP and United States to file these videos as exhibits on the docket so that this evidence could become part of the court record. In response, the BOP and United States assured that they would file these documents with their own designation

---

[2] The Court observes that White's separate statement of material facts at Dkt. 189-1 contains handwritten recitations of over 20 pages of BOP Policy and Regulations that are not produced within his exhibit documents filed in the record at Dkt. 219. Further, he often cites facts in his statement of material facts that are not actually contained or referenced within his supporting evidence or affidavit. Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A Court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

of evidence when responding to White's motion for summary judgment. These videos were filed by CD by the United States and BOP on May 28, 2025. (Dkt. 204). Accordingly, White's motion is **granted to the extent** that these videos have been filed and are a part of the record to be considered for summary judgment purposes.

### D.  Motion to Strike Deposition (Dkt. 211)

On June 18, 2025, White filed a motion to strike his own deposition testimony. (Dkt. 211). In that motion, White asserts that because he was not provided the deposition transcript to read and sign, the deposition must be stricken in its entirety. However, as the Federal Defendants correctly argue, White has not identified any changes he sought to make in the deposition transcript, so to strike the entirety of the deposition is improper. *Novak v. State Parkway Condo. Ass'n*, 2017 WL 3597482, at *2 (N.D. Ill. Aug. 21, 2017). Further, the Federal Defendants have propounded evidence that White was provided with the contact information of the Court Reporter on the day of the deposition, and he had been provided a complete copy of the deposition transcript by the time their summary judgment motion was filed on May 14, 2025. The Court has no reason to believe that White's deposition transcript contains errors or mistakes that render it so erroneous as to strike it in its entirety. As such, White's motion to strike his own deposition transcript (Dkt. 211) is **denied**.

### E.  Motion to Strike Ex Parte Testimony of Robert T. Decker (Dkt. 213)

White asks the Court to strike Decker's deposition testimony because White was not permitted to attend the deposition in person; instead, he was allowed only to submit written questions. (Dkt. 213 at 2). White states that he has deposed numerous other individuals at his expense, and he believes that he was denied due process when the Magistrate Judge granted the Federal Defendants' motion for White to depose Decker by written questions only. In so much as

Decker's testimony within his deposition transcripts contradicts previous testimony given by Decker, the Court has reviewed any and all conflicting evidence on the record and has made note of relevant conflicting testimony within this order. To the extent that White requests for Decker's deposition transcript to be stricken in its entirety, that motion is **denied.**

Despite the Order allowing him to submit written questions, White failed to submit any questions for Decker's deposition and instead filed an Objection to Doc 122, the Magistrate Judge's order. (Dkt. 131). The undersigned found that "the Magistrate Judge's decision to allow the Government Defendants to depose White and to require him to participate in Decker's deposition by written questions was not clearly erroneous or contrary to law." (Dkt. 244 at 7). White's disagreement with the Court's order does not warrant a complete strike of Decker's deposition testimony, and his decision to not question Decker via written questions does not allow him to eliminate this testimony from the record. This motion to strike is **denied.**

### F. Motion to Strike the Opinion Testimony of Gina Sacchetti, Annabel Fields, and Kelsey Thomas (Dkt. 214) and Motion to Strike the Opinion Testimony of Joshua Emerson (Dkt. 217)

White next moves to strike the affidavits of four different BOP employees who have offered testimony for the Federal Defendants' motion for summary judgment. In support of his motion, White alleges that the testimony of three of his treating physicians, Gina Sacchetti (Dkt. 203-4), Annabel Fields ("Dr. Fields") (Dkt. 203-5,) and Kelsey Thomas were not disclosed to him as expert witnesses prior to the close of discovery, and that the testimony they purport to provide consists of inadmissible expert testimony. (Dkt. 214 at 1–2). However, the Federal Defendants' response notes that White disclosed these individuals himself on his own witness list, and their initial disclosures denote that they include "All persons disclosed by Plaintiff, whether or not called by Plaintiff." (Dkt. 220-1 at 3). White confirmed receipt of these pleadings by filing a copy of

these disclosures as an exhibit to his motion to strike. (Dkt. 220). Later, on December 26, 2024, the Federal Defendants disclosed Sacchetti and Thomas again in their expert disclosures. (Dkt. 242-2 at 2–6).

The only individual not disclosed as an expert witness is Dr. Fields, a former treating provider. Treating providers are considered hybrid fact/expert witnesses that "may testify about facts learned and opinions formed from his personal knowledge during the course of his employment." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 370–71 (7th Cir. 2017). This limitation means that, for purposes of summary judgment, these providers will only be allowed to testify as to their personal observations, diagnoses, and treatment contained in the medical records and formed in the course of treatment and will not be allowed to testify to any newly formed opinions that exceed that role. *See Bowersock v. Davol, Inc.*, 236 F. Supp. 3d 1074, 1088 (S.D. Ind. 2017) (treating physician not disclosed as expert and testifying as fact witness "may present treatment evidence concerning the autopsy and exhumation of [the decedent's] body, [but] he may not testify as to any newly formed opinions that exceed that role, which includes evidence of causation not included in his Autopsy Report"); *Ballinger v. Casey's Gen. Store, Inc.*, No. 10-cv-1439, 2012 WL 1099823, at *5 (S.D. Ind. Mar. 29, 2012) (limiting treating physician to testifying to "personal observations, diagnoses, and treatment contained in the medical records and formed in the course of treatment" where plaintiffs failed to provide proper expert disclosures); *Caldwell v. City of Chicago*, No. 08 C 3067, 2010 WL 380696, at *4 (N.D. Ill. Jan. 28, 2010) (treating physician not disclosed as expert witness limited to testifying about "his personal observations, diagnoses, and treatment" of the plaintiff and prohibiting physician from "testifying concerning opinions that he has subsequently formed" or "any causation issues.")

The information White attempts to strike regarding Dr. Fields are direct observations that she made while treating him at Marion FCI or information contained directly in his medical records. This falls directly within the scope of her allowable testimony as a treating physician. Accordingly, there is no rationale for striking this information, and White's motion (Dkt. 214) is **denied**.

White also filed a motion to strike the testimony of Officer Joshua Emerson ("Officer Emerson"). (Dkt. 217). White again argues that Officer Emerson's testimony consists of expert opinions. Specifically, he objects to the following statements:

> 8. Based on my training and experience over 19 years, I am very familiar with OC spray [Oleoresin Capsicum] and its use. I know that OC spray wears off after 20 minutes. When I worked for the state, I went through advanced training and have been sprayed with OC spray through my training. I knew firsthand the effects of OC spray.
>
> 9. The reason that OC spray is used is because it is the safest chemical agent available. It is safe for indoor use and it is made from peppers, so it is a naturally occurring chemical agent. Unless someone is allergic to peppers, it is not going to have a serious affect.

(Dkt. 203-6 at 2). White argues that because Officer Emerson was not disclosed as an expert witness and this consists of expert testimony, his whole affidavit should be stricken. Rule 701 of the Federal Rules of Evidence provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

The decision of "'whether to admit testimony under Rule 701 is committed to the sound discretion of the trial court and a ruling will not be reversed absent a finding that the trial court abused its discretion.'" *United States v. Stormer*, 938 F.2d 759, 761 (7th Cir. 1991) (quoting *United States v. Towns*, 913 F.2d 434 (7th Cir. 1990)) (internal citations omitted). A determination made by a trial

judge regarding the admissibility of evidence '"is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of [her] familiarity with the case and ability to gauge the likely impact of the evidence in the context to the entire proceeding."" *United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000) (quoting *United States v. Torres*, 977 F.2d 321, 329 (7th Cir. 1992)).

Here, the Court finds that Officer Emerson's testimony is lay opinion testimony and shall not be stricken. These observations were made from the officer's specialized personal knowledge and training and do not constitute expert opinions. *United States v. Bogan*, 267 F.3d 614, 619 (7th Cir. 2001). And even if the Court had determined that these were expert opinions, only the objectionable content would be stricken and not the affidavit in its entirety. White's motion (Dkt. 217) is **denied**.

### G. Motion to Strike the Declarations of Jamie Wheeler and the Declaration of Rebekka Eisele (Dkt. 220)

White finally moves to strike the affidavits of two BOP employees who have offered testimony for the Federal Defendants' motion for summary judgment, Jamie Wheeler and Rebekka Eisele. (Dkt. 220). White contends that these individuals were not disclosed to him on the Federal Defendants' initial disclosures. (Dkt. 214 at 1–2). However, similar to White's previous attempts to strike witness testimony, White disclosed these individuals himself on his own witness list, and the Defendants' initial disclosures denote that they include "All persons disclosed by Plaintiff, whether or not called by Plaintiff." (Dkt. 220-1 at 3). White confirmed receipt of these filings by filing a copy of these disclosures as an exhibit to his motion to strike. (Dkt. 220). Further, the Federal Defendants preliminary witness list included these individuals as well. (Dkt. 176 at 2).

The Seventh Circuit has noted discovery disclosures "provide information early in the proceedings to allow the parties to pursue discovery, collect evidence, and take necessary

depositions." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 947 (7th Cir. 2024). White had ample time to pursue discovery and collect evidence regarding these individuals, as they were even named as relevant parties in his own amended complaint. (Dkt. 76 at 6, 9, 11). Further, because he has been aware of the relevancy of the testimony of these individuals, White cannot claim he is prejudiced by any alleged lack of disclosure. His motion to strike them (Dkt. 220) must be **denied**.

### III.    FACTUAL BACKGROUND

The following facts are not in dispute except as noted.

### A. The Parties

At all relevant times, White was an inmate incarcerated within the BOP and he has been incarcerated since 2008. (Dkt. 203-10). At the time of the incident in question, White was incarcerated at the Federal Correctional Institute in Terre Haute Indiana ("Terre Haute FCI"). (Dkt. 203-10 at 1). Decker was also a BOP inmate that was confined to the Terre Haute FCI during the time in question. (Dkt. 203-2 at 14).

While the relevant incident occurred at Terre Haute FCI, both White and Decker had previously been housed at Marion FCI at the same time. (Dkt. 203-2 at 14).

### B. BOP Policy

The BOP establishes inmate housing classifications to ensure the safety and welfare of the inmates and staff at each facility. (Dkt. 203-19 at 1). Once the BOP has made a housing classification for an inmate, the housing facility will assign the inmate according to their housing classification. *Id.* In 2021, Terre Haute FCI had a Communication Management Unit ("CMU"), which is an administrative unit designed to place inmates in an environment that enables BOP staff to more effectively monitor inmate communications within the CMU and the community. Whether an inmate is classified to be housed in the CMU depends on an inmate's criminal history, including

sensitive information, expertise of other law enforcement and intelligence agencies, and any other relevant data. *Id.*

Within the CMU is a Special Housing Unit ("SHU"), which houses inmates for disciplinary or administration reasons. (Dkt. 203-8 at 1). While housed in the CMU SHU, inmates were not permitted to have books, magazines, or periodicals delivered to their cells because they were deemed a safety hazard, as they can be piled up and used to set fires. (Dkt. 203-8 at 2).

BOP Officers undergo advanced training on the use of OC spray to diffuse altercations. (Dkt. 203-6 at 2). OC spray is used because it is the safest chemical agent available. *Id.* It is safe for indoor use, and it is made from peppers, so it is a natural occurring chemical agent that is safe for most individuals unless someone has an allergy. The effects of OC spray usually fade after 20 minutes. *Id.* Officer Brad Calloway ("Officer Calloway") testified that "[a]fter an incident with multiple inmates when OC spray is used, [a single officer] ha[s] to wait until other officers arrive before [they] can take someone to the showers for decontamination." (Dkt. 203-7 at 2).

### C. White's Mental Health

White suffers from Post Traumatic Stress Disorder ("PTSD"). His mental health records reflect that, during the time in question, he maintained a status of Care Level 1, the lowest level of care, because he "displays no significant level of functional impairment associated with a mental illness, demonstrates no need for regular mental health interventions and has no history of serious functional impairment due to mental illness. (Dkt. 203-13 at 2).

On November 24, 2021, while at Marion FCI, White was diagnosed with PTSD "by history," meaning that because he was previously assigned the diagnosis in the past in his medical documentation, it was then incorporated into his current diagnostic charts. (Dkt. 203-4 at 1). Dr. Fields, the Chief Psychologist at Marion FCI, opined that White did not meet the full criteria for a

diagnosis of PTSD at the time of the charting of this historical diagnosis. *Id.* On or about January 18, 2022, White was placed on Remeron, an antidepressant, which he reported to his mental health provider eliminated his PTSD symptoms "80-90%." (Dkt. 203-13 at 20). White continued to be prescribed Remeron while at Terre Haute FCI. (Dkt. 203-1 at 61).

The only symptom of PTSD White reported to Dr. Fields was difficulty sleeping. (Dkt. 203-4 at 2). Dr. Fields reports that "[a]t the time that I treated him until the time that he left Marion – FCI, there was nothing to indicate that placing White in a Special Housing Unit ("SHU") would be detrimental to his mental health or exacerbate symptoms related to PTSD by history. He was stable in the CMU and it is likely that he would have remained stable in the SHU." *Id.*

At least once per month at Terre Haute FCI, someone from Psychology Services made rounds in the CMU SHU while White was housed there. (Dkt. 203-1 at 64). White had seven contacts with psychology services while in the SHU at Terre Haute FCI, and he never reported any symptoms secondary to PTSD while housed there. (Dkt. 203-13 at 4–12). Although White made requests from psychology services for copies of his mental health records, he never requested any psychology services during his time at FCI Terre Haute. (Dkt. 203-13 at 4–12.) Upon his transfer out of Terre Haute FCI, White was assessed at a Federal Transfer Center in Oklahoma. (Dkt. 203-17 at 2). When he was assessed in Oklahoma, staff charted that he "presented with no indication of dysfunction and did not present with any significant symptoms of mood disorder … [or] appear to be in overt distress or crisis…" and was not "presenting with a trauma response or any symptoms secondary to PTSD." *Id.*

**D. Relevant Facts Prior to White's Placement at FCI Terre Haute and Transfer**

Before his arrival at Terre Haute FCI, White had been placed on a correspondence restriction which included screening his communications with outside individuals. (Dkt. 203-8 at

2). Starting in 2018 and while they were both incarcerated at Marion FCI, White and Decker became acquainted with each other, and White provided Decker with legal assistance. (Dkt. 203-1 at 11). However, shortly thereafter, the relationship soured, in part because White believed that Decker was an "informant" and the two were no longer on speaking terms. *Id.* at *15.* While at Marion FCI, Decker never directly threatened White, but others had conveyed to White that Decker had made threats against him. *Id.* at 16–17. White was not afraid of Decker and never advised any BOP staff at Marion FCI that he was fearful of Decker or could not be housed with him. *Id.*

Decker believed that he was transferred from Marion FCI to Terre Haute FCI because White contacted the AUSA's office and BOP made the decision to separate the two inmates. (Dkt. 203-2 at 20). However, there is no evidence in the record to support that contention. After Decker arrived at FCI Terre Haute, he told Lt. Sherman and Officer Wheeler "if you move [White] in here, we're gonna have a problem." *Id.* at 23. Decker also testified that he told Lt. Sherman "Look, if you bring this guy on the tier, I don't know what he's going to do to me. But I know what I'm going to do what I need to do to defend myself." *Id.*

White had previously engaged in a physical altercation with another inmate in October of 2021 at Marion FCI. (Dkt. 203-11 at 1, 3). A day before his transfer to Terre Haute FCI, White was told by another inmate that Decker had told him that if White was transferred to Terre Haute FCI, Decker would assault him. (Dkt. 189-1 at 19).

On January 21, 2022, White was transferred from Marion FCI to Terre Haute FCI. (Dkt. 203-10 at 1). During the time in question, Psychology Services charting reflects that BOP at one time categorized White as a domestic terrorist, which prompted them to assign him CMU housing at the Terre Haute FCI. (Dkt. 203-13 at 3). White contests this classification and denies being a

domestic terrorist. (Dkt. 226 at 3). Upon his transfer, White was assigned to the SHU for processing and then eventually released to the CMU general population on February 8, 2018. *Id.*

### E. The Altercation

The altercation is partially captured on video; however, the video has no audio and is visually difficult to discern. On February 18, 2022, at approximately 9:00 PM, White was sitting in his cell reading, when Decker pulled open the door and entered White's cell in the CMU general population unit. (Dkt. 203-1 at 18). Decker started yelling at White that he needed to "keep my name out of his mouth" because White had "messed him up with the US Attorney." *Id.* at 19. White stood up and [he] started yelling back at Decker, that Decker tried to tell on him, and "that he messed himself up and needed to get out of my cell." *Id.* Decker backed out of the cell. Although White initially thought Decker was trying to start a fight, when Decker backed out, White assumed Decker was "full of hot air." (Dkt. 203-1 at 19). White began walking after Decker and said something like "What are you doing? What are you trying to do?" *Id.* at 20. Video evidence then shows Decker punching at White and Decker retreating down the hallway. (Ex. 24(A) at 00:50–01:03). White then followed Decker, and Decker intentionally crashes into White, and White tries to push Decker off him. *Id.* White describes that

> suddenly [Decker] goes running again. I kind of lurch forward because the pressure was suddenly taken off me. He goes running again, and I go walking towards him, and I'm still like, like, what are you doing? You know, what are you trying to do? And so, I walked around the corner. He turned around and looked at me again. He looked like he was going to run into me again. So, I put my hands up. Then he turned and ran away, and then I saw something on the corner of my eye. I looked over, I saw Calloway. Calloway unloaded his OC spray into my face, at which point I was blinded.

(Dkt. 203-1 at 20–21).

Two BOP officers, Officers Calloway and Emerson, were patrolling the CMU that night. (Dkt. 203-7 at 1). When Officer Calloway walked up the stairs, he observed both White and Decker

fighting in front of a cell and he ordered White and Decker to get on the ground, but the two failed to comply. *Id.* White testified that he did not hear the command ordering him to get on the ground. (Dkt. 203-18 at 1). The video shows Officer Calloway approach the inmates who appear to be tussling, and he begins dispensing OC spray; however, it is difficult from the video to determine how long the spray was utilized. (Ex. 24(A), at 01:10–01:16). White testified that he never struck Decker with a closed fist. (Dkt. 189-1 at 23), and the video does not confirm or contradict this testimony.

At his deposition, Decker testified that on February 18, 2022, he was told that White had accused him of being a snitch. (Dkt. 203-2 at 28). So Decker walked over to White's cell, opened up his cell door, entered and said, "Look man, you need to keep my name out of your mouth, bro. I'm tired of hearing it, man." *Id.* at 29. The two argued and Decker told White "we can do it out here or we can do it in your cell. It doesn't matter. I don't really care, bro." *Id.* White then exits his cell and again accuses Decker of being a snitch, and they got into a "fight" or "altercation in [the] hallway". *Id.* at 33.[3] Decker testified that the altercation happened so quick that he cannot recall if White ever struck or hit him. *Id.* at 35. When Decker heard Officer Calloway yell, "Break it up," Decker took off. *Id.* At his disciplinary hearing, Decker plead guilty to fighting. *Id.* at 40.

Because he was the only officer on the range close to the altercation, Officer Calloway used OC spray because it was unsafe for him to manually attempt to separate the inmates. (Dkt. 203-7 at 1). White and Officer Calloway were both hit with the spray, but Decker was not. (Dkt. 203-1 at 29–30).

The video shows Officer Emerson approach the inmates after the deployment of spray from the other end of the hallway, and Officer Calloway and Officer Emerson separately escorted

---

[3] When questioned further about the fight, Decker testified "for the record there was an altercation and I can't say anything else on the grounds that it may incriminate myself and I'm pleading the fifth." (Dkt. 203-2 at 33-34).

Decker and White out of the area. White was blinded by the OC spray. Sometime later, White was taken downstairs and held with his face against a lower corridor for 10–15 minutes before he was taken to a medical interview. (Dkt. 189-1 at 39–40). White was then taken to decontamination and needed medical assistance. (Ex. 25 at 5:42–11:22). He was not allowed to receive a decontamination shower for 30 minutes. (Dkt. 189-1 at 39–40). Later that evening, Officer Calloway apologized to White for spraying him and explained that he had also sprayed himself with OC spray. *Id.*

White testified that Decker did not stand a chance fighting him, as White is a much larger person. (Dkt. 203-1 at 22). He believes Decker is "basically a set up artists" who sets people up for problems" and Decker came into his cell with the intent of starting something and then have the guard interrupt it, so that the guard would fight White.

After the altercation with Decker, White was charged with fighting and was assigned to the CMU SHU as a disciplinary measure until his eventual transfer from Terre Haute FCI to an Oklahoma Federal Transfer Center on July 21, 2022. (Dkt. 203-1 at 86). The BOP investigator determined that Decker and White would be separated for their mutual safety. (Dkt. 203-18 at 7). White has never been diagnosed with emotional distress resulting from his time in the SHU at the Terre Haute FCI, the altercation that he had with Decker, or being sprayed with OC spray during his altercation with Decker. (Dkt. 203-1 at 33–34).

On March 11, 2022, a disciplinary hearing was held for White regarding the October 2021 altercation at Marion FCI and the February 2022 altercation with Decker at Terre Haute FCI. (Dkt. 1 at 9–10). White only requested to add a single witness to the hearing who allegedly witnessed the altercation with Decker, Mohammed Issa; however, there was no inmate with that name at Terre Haute FCI. (Dkts. 203-9, 203-8 at 2). The disciplinary hearing officer held two separate

hearings on the charges and found that White committed the acts as charged. (Dkts. 203-11, 203-12). In making this determination, the disciplinary hearing officer considered the incident reports, staff memorandum, the video, White's statements, and White's disciplinary history. (Dkts. 203-5 at 1, 9–10, 203-12 at 3). White received various penalties for the October 2021 fighting incident, including a loss of 27 days of good conduct time and a $100 fine. (Dkts. 203-11 at 3, 190 at 57). For the altercation with Decker, White lost good conduct time and email privileges for 90 days and was assessed a $300.00 fine. (Dkt. 203-12 at 3).

### F.  White's Property

When an inmate transfers from one CMU to another CMU at a different facility, the Counter-Terrorism Unit reviews and approves all items that are sent out of the unit to ensure that the distribution of those items would not pose a security issue. (Dkt. 203-19 at 2). When White transferred out of Terre Haute FCI, there was limited staffing in the CMU to organize and review his personal property, so the process took longer than usual to approve it and mail it to him at his new facility in Cumberland, Maryland. (Dkt. 203-19 at 3).

From March 14 to May 4, 2022, White was unable to purchase items from the limited selection available to CMU SHU inmates. (Dkt. 189-1 at 40). A BOP officer told him that he was unable to purchase items because he was on a hygiene restriction for refusing to pay a fine. *Id.* White then made an inquiry regarding his unpaid balance and paid all fines on May 24, 2022. *Id.*

During the period of February 18 to July 22, 2022, White subscribed to the *Wall Street Journal*, *Barron's*, *American Free Press*, *the Barnes Review*, *Criminal Legal News*, and *Prison Legal News*. (Dkt. 189-1 at 42). However, White only received two copies of these numerous publications during his time in the SHU and did not receive a rejection or confiscation notice for any of these materials from BOP. *Id.* White observed an instance where an inmate's books were

taken from him after he was transferred out of FCI Terre Haute and later that inmate's books were added to the CMU reading library. (Dkt. 189-1 at 44). White was told by a BOP officer that these items were taken from the inmate against his wishes and this was common practice at the BOP. *Id.* After White was transferred from Terre Haute FCI, he received some but not all of his personal property one year later. (Dkt. 203-1 at 131–33). White was missing 10 boxes that contained 46 books and a radio. *Id.*

## IV.  **DISCUSSION**

White brings nine distinct categories of claims against the United States and BOP and two claims against Decker. The Court lists these claims below and discusses each in turn:

1. Negligence and negligent infliction of emotional distress against the United States under the Federal Tort Claims Act ("FTCA");

2. Intentional Infliction of Emotional Distress ("IIED") against the United States under the FTCA;

3. Assault and battery against the United States under the FTCA;

4. Trespass to chattels against the United States under the FTCA;

5. Violation of the Administrative Procedures Act ("APA") against the BOP for assessing a monetary fine;

6. Violation of the APA against the BOP for denying him access to newspapers and magazines;

7. Violation of the APA and the Due Process Clause of the Fifth Amendment against the BOP for finding him guilty of disciplinary charges;

8. Violation of the Rehabilitation Act against the BOP and United States for failing to accommodate his PTSD;

9. Violation of the Little Tucker Act against the BOP and United States for taking his property for public use without compensation;

10. Intentional infliction of emotional distress against Decker;

11. Assault and battery against Decker;

### A.  Claims Against the BOP and United States

#### a.  Negligent Infliction of Emotional Distress ("NIED") and Negligence

The FTCA is a limited waiver of the United States' sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of negligence of government employees. *See United States v. Muniz*, 374 U.S. 150 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b).

For a claim proceeding under the FTCA, Indiana substantive law applies. 28 U.S.C. § 1346(b)(1); *see also 28 Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred."). To state a claim for negligence under Indiana law, White must allege that the United States owed a duty to him, it breached that duty, and the breach caused White's injuries. *Looney v. Nestle Waters North America, Inc.*, 187 N.E.3d 867, 872 (Ind. Ct. App. 2022).

White asserts a negligence claim as the basis of his NIED claim, alleging negligence in "placing [him] in a population unit with Decker, spraying [him] in the face with OC spray, withholding medical care for [his] OC spray related injuries, holding [him] in the described SHU conditions January 21 to February 8, 2022, and February 18 to July 21, 2022, without the required process; . . . falsifying records to cover up the assault on [him], to justify holding [him] in SHU, to justify transferring [him], and to deny [him] access to commissary . . . denying [him] psychological care for his PTSD during his SHU confinement." (Dkt. 76 at 11–12). However, the designated evidence reflects that no reasonable juror could find that there is a dispute of material

fact as to White's negligence or NIED claims, and summary judgment must be **granted** for the Federal Defendants.

For his negligence claim, White first must establish that the Federal Defendants had such a duty in the circumstances that arose. The parties agree that a duty was owed to White in this case, and that 18 U.S.C. § 4042 accurately states that duty. *United States v. Muniz*, 374 U.S. 150, 164–65 (1963). In regard to the duty owed to White, statute dictates that the BOP shall

> (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

§§ 4042(a)(1)–(3).

There is no evidence, however, that White's placement in the SHU at Terre Haute FCI constituted a breach of duty. When White arrived at Terre Haute, he was placed in the CMU SHU consistent with the facility's policy to place an incoming inmate on an administrative detention "until the staff is able to complete their intake assessment and determine that they can safely be placed in the CMU general population." (Dkt. 203-8 at 1). Further, White's previous treating physician testified that before his placement at Terre Haute FCI, there were no indications that being placed in a SHU would be detrimental to his PTSD. Dr. Fields specifically testified that "[a]t the time that I treated [White] until the time that he left Marion – FCI, there was nothing to indicate that placing White in a SHU would be detrimental to his mental health or exacerbate symptoms related to PTSD by history. He was stable in the CMU and it is likely that he would have remained stable in the SHU." (Dkt. 203-4 at 2). Finally, the decision to remove White back to the CMU SHU after the altercation with Decker was for his own safety. BOP staff appropriately separated the parties, and White received a separation assignment in his file to protect him from further attack.

(Dkt. 203-8 at 1). Although White may not have preferred to be placed in disciplinary segregation after the altercation, the BOP was not negligent in the decision to change White's placement. No reasonable juror could find that White's placement in the SHU amounts to negligence by the Federal Defendants.

And similarly, no reasonable juror could find that the BOP Officer's use of OC Spray rises to the level of negligence. White moved for summary judgment related to the DHO's disposition of his disciplinary charge for this incident. (Dkt. 189 at 25). In that motion, White argues that he never struck Decker *at all*, and consequently, that the OC spray used on him must have been negligent. *Id.* Later, White responded to the Federal Defendants' motion for summary judgment by stating

> As I have repeatedly averred, Decker charged at me full speed trying to use his body weight to knock me over. One of my hands got pinned between us as I tried to push him off me . . . . The simple fact is that I've never contested a fighting shot on the basis I didn't hit a guy where I hit the guy and wouldn't have contested it here if I hadn't been given the impression by the DHO that there was a much clearer video. But, regardless, the video doesn't show me trying to hit Decker.

Dkt. 226 at 22–23.

"Where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). The summary judgment record contains video of the incident that captures the altercation from some distance, so White's claims that he did not strike Decker are neither supported nor contradicted by the video. But because White participated in the altercation and followed Decker into the hallway, he is at greater fault than the BOP officer who used force in accordance with BOP policy.

Under Indiana's Comparative Fault Act, a plaintiff is barred from recovery if their contributory fault is greater than the fault of the defendant. Ind. Code § 34-51-2-5. Under Indiana law, "[c]ontributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm the plaintiff has suffered, which falls below the standard to which the plaintiff is required to conform for his or her own protection." *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 239 (Ind. Ct. App. 2001). Here, White's participation in the alteration was a contributing legal cause to the discomfort caused by the OC spray, which was a temporary inconvenience required to establish order on the cell block. The designated evidence establishes that the effects of the OC spray typically last only 20 minutes, and Officer Emerson reasonably used the spray to deescalate the altercation because he was the only officer at the scene. (Dkt. 203-6 at 1–2). White was provided medical care and a decontamination shower within 30 minutes of the spray. This was reasonably prompt and the 30-minutes between White's removal from the cellblock and decontamination shower does not render the defendants negligent. No reasonable juror could find that this act was negligent, and summary judgment must be **granted** as to this claim.

Finally, none of these acts constitute NIED because no underlying act was negligent. "Indiana has allowed recovery for negligent infliction of emotional distress in those circumstances involving an impact to the plaintiff's person under what has been named the 'direct impact' rule or its progeny, the 'modified impact' rule." *Ketchmark v. N. Indiana Pub. Serv. Co.*, 818 N.E.2d 522, 523 (Ind. Ct. App. 2004). The Indiana Supreme Court has described the modified impact rule as follows:

> When . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, we hold that such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

24

*Shuamber v. Henderson*, 579 N.E.2d 453, 456 (Ind. 1991). "[I]t matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct." *Michel v. Pretorius*, No. 24-CV-00588, 2025 WL 1827944, at *3 (S.D. Ind. July 2, 2025) (citing *Conder v. Wood*, 716 N.E.2d 432, 435 (Ind. 1999)).

Here, there was no negligent conduct or act by the Federal Defendants, except for the placement as described below, so the Court finds that White does not have a foundational claim for a NIED claim to succeed. *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 865–66 (S.D. Ind. 2014) ("negligent infliction of emotional distress is not an independent tort, and having failed to prove the predicate tort … [plaintiff's] negligent infliction of emotional distress claim also fails"). As such, summary judgment is **granted** for the Federal Defendants as to these claims.

As to the attack itself, to prove negligence, White must show that BOP staff knew or reasonably should have known of a potential problem between himself and Decker. *Parrott v. United States*, 536 F.3d 629, 636–37 (7th Cir. 2008). There is a dispute of material fact as to whether BOP should have known to separate White and Decker. The record reflects that White himself never reported to any BOP staff that they needed to be separated, but Decker testified that he specifically told two BOP officers, Lt. Sherman and Officer Wheeler, prior to the altercation that if White was transferred to general population "we're gonna have a problem." (Dkt. 203-2 at 23). Despite this knowledge, the BOP still made the decision to place both individuals in general population together. A reasonable juror could find that this amounts to negligence by the Federal Defendants. Accordingly, summary judgment as to this claim must be **denied.**

Finally, White's NIED claim must fail related to his placement because although BOP's actions may have been negligent, White has not proved that the event caused him emotional

distress. White's medical expert report reflects that White had a PTSD diagnosis, but the report specifically describes a myriad of incidents that exacerbated White's PTSD that were unrelated and occurred prior to the attack. And White's own deposition testimony reveals that he did not take the attack seriously and found it humorous. (Dkt. 203-1 at 25). The only testimony of the emotional impact comes from White's contradictory testimony in his discovery responses and affidavits. However, "'[i]n this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.'" *Perez v. Staples Contract & Commercial LLC*, 31 F.4th 560, 569 (7th Cir. 2022) (quoting *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020)). "The goal of the rule is to preclude the manipulation of testimony to avoid an adverse summary-judgment ruling." *Id.* White cannot create a dispute of material fact merely by creating contradicting affidavit testimony. Accordingly, summary judgment is **granted** as to all NIED claims against the Federal Defendants.

### b. Intentional Infliction of Emotional Distress ("IIED")

To succeed on a claim of intentional infliction of emotional distress, White must prove that the defendants "(1) engaged in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress." *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind. 1997) (quoting Restatement (Second) of Torts § 46 (1965)); *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 549 (Ind. Ct. App. 2015).

White offers no insight into how Defendants engaged in extreme or outrageous conduct that intentionally or recklessly caused him severe emotional distress. Although White was dissatisfied with his placement in segregation and treatment by BOP officers, the evidence does not reflect that the BOP was extreme or outrageous in their care of White. Even if there is a dispute of material fact as to whether the BOP was negligent in placing White with Decker, this action

does not rise to the level of 'extreme or outrageous' to sustain an IIED claim related to the placement. None of the actions taken by BOP in the care of White can reasonably be viewed as extreme and outrageous, and accordingly, summary judgment is **granted** as to these claims.

Finally, there is no evidence that White was suffering from severe emotional distress which would allow him to succeed on an IIED claim. When White was assessed at a Federal Transfer Center in Oklahoma directly after transfer, he "presented with no indication of dysfunction and did not present with any significant symptoms of mood disorder . . . [or] appear to be in overt distress or crisis" and was not "presenting with a trauma response or any symptoms secondary to PTSD." (Dkt. 203-17 at 2). And although White argues he suffered from emotional trauma after the incident, the record does not reflect any increase in White's PTSD symptoms despite his ability to access psychiatric care within the CMU SHU. The evidence reflects only that White had seven interactions with mental health staff during the time period in question and was assessed the lowest care level during that time. "Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (cleaned up). Here, White's conclusory statements are not sufficient to prove his claim.

For these reasons, summary judgment is **granted** for the Federal Defendants on his IIED claim.

### c.  Assault and Battery

Finally, White also included in his Amended Complaint a state law claim against the Federal Defendants for assault and battery stemming from the OC spray incident. Defendants are entitled to summary judgment on this claim.

In Indiana, a law enforcement officer is "privileged to use only that force which is reasonable and necessary," and if "he uses unnecessary force his conduct is no longer privileged,

and he is answerable for an assault and battery." *City of S. Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. Ct. App. 1979); *Wilson v. Isaacs*, 929 N.E. 2d 200, 203 (Ind. 2010) ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery.").

Under Indiana law, a defendant commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Singh v. Lyday*, 889 N.E.2d 342, 360 (Ind. Ct. App. 2008) (quoting *Mullins v. Parkview Hospital, Inc.*, 865 N.E.2d 608, 610 (Ind. 2007)). An assault occurs "when one acts intending to cause a harmful or offensive contact with the person of the other or an imminent apprehension of such contact." *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind. 1991) (citing Restatement (Second) of Torts § 21 (1965)). Because assault and battery are intentional torts, the defendant is only liable if he acted recklessly or with reckless disregard of the consequences. *Turner v. Sheriff of Marion Cnty.*, 94 F. Supp. 2d 966, 994 (S.D. Ind. 2000).

The facts and evidence discussed above, including the videotape, reveal that Officer Emerson's use of OC spray was reasonable and necessary. The pepper spray was used to subdue White and Decker, who were actively engaging in a physical altercation as shown by video evidence. No reasonable jury could conclude that this brief use of force was for any purpose other than to restore order. *See Moore v. Hosier*, 43 F. Supp. 2d 978, 989 (N.D. Ind. 1998) (granting summary judgment for the defendants on assault and battery claim where officers restrained the plaintiff to a chair and pepper sprayed him in order to subdue an uncooperative inmate).

Accordingly, the Federal Defendants are entitled to summary judgment on White's claim for assault and battery.

### d. Violations of the Administrative Procedures Act ("APA")

The APA provides for judicial review of an agency action that adversely affects a person. 5 U.S.C. § 702. An aggrieved person may bring an action against the United States "seeking relief other than money damages." *Id.* Section 706(1) of the APA directs that a court sitting in review of an agency action shall "compel agency action unlawfully withheld or unreasonably delayed." Section 706(2)(A) of the APA directs that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### i. Access to Personal Property in SHU

White next brings claims related to the deprivation of his newspapers and personal property while he was incarcerated in the CMU SHU. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Constitutional rights inside a prison or jail, however, are not identical to those outside; "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere." *Beard v. Banks*, 548 U.S. 521 (2006). Courts acknowledge that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 at 84–85. Courts must therefore "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Balancing these two considerations, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Turner*, 482 U.S. at 89. To determine reasonableness, the Court must consider four factors: whether the regulation is rationally connected to a legitimate and neutral government objective; whether alternative means of exercising the right remain open to the inmate; what impact accommodation of the asserted right will have on guards and other inmates; and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) (citing *Turner*, 482 U.S. at 89–91). "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132.

White has moved for summary judgment on this claim. (Dkt. 189 at 26). He argues that the restriction on newspapers to inmates in the SHU is not a national policy, and therefore Terre Haute FCI's restriction violates the APA. He argues that if newspapers were truly a fire hazard, BOP staff could switch his newspaper out each day. Finally, he argues that there is no evidence that the BOP warden ever enacted withholding newspapers and magazines as a formal BOP policy which would violate the *Turner* test.

As to White's last point, the Federal Defendants have cited the formal BOP policies that prohibit newspapers and excessive property for SHU inmates. Terre Haute FCI's relevant policy dictates that "inmates in the CMU SHU do not receive newspapers, magazines, and periodicals because it is a fire hazard." (Dkt. 203-14 at 14), 13 § 541.31(h). Program Statement § 5270.12 - Special Housing Units denotes that the "amount of personal property may be limited for reasons of fire safety or sanitation." (Dkt. 203-14 at 14), 13 § 541.31(h). "In disciplinary segregation status [an inmate's] personal property will be impounded, with the exception of limited reading/writing materials, and religious articles." *Id.* at 15, 13 § 541.31(h)(2).

The BOP's regulations regarding inmate property within the SHU are rationally connected to a legitimate and neutral government objective – inmate safety and fire prevention. Further, the Federal Defendants are correct their assertion that White lacks standing to pursue any injunctive relief since he has since been transferred from Terre Haute FCI's CMU. *See Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot."). Further, no reasonable juror would find that the decision to limit inmate personal property in secured housing is arbitrary or capricious. Summary judgment must be **granted** for the Federal Defendants and **denied** for White as to these claims.

### ii. Disciplinary Measures

White challenges the validity of the disciplinary decision issued as a result of the altercation with Decker. The Federal Defendants argue persuasively that White's civil attack on his disciplinary adjudication is barred. The United States Supreme Court decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), "bars any suit for damages premised on a violation of civil rights if the basis for the suit is inconsistent with or would undermine the constitutionality of a conviction or sentence." *Wiley v. City of Chicago*, 361 F.3d 994, 996 (7th Cir. 2004). "That rule, as extended in *Edwards v. Balisok*, 520 U.S. 641 (1997), precludes a plaintiff from pursuing a constitutional claim that implies the invalidity of an extant ruling by a prison disciplinary tribunal." *Decker v. Baez*, 2023 WL 4106247, at *1 (7th Cir. June 21, 2023), *cert. denied*, 144 S. Ct. 408 (2023). In *Heck* and related decisions, the Supreme Court "focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement." *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005).

Pursuant to *Heck*, White's claims related to the validity of his disciplinary case must be dismissed. The allegations before the Court go directly to the validity of his state prosecution. White challenged the disciplinary hearing through an unsuccessful administrative remedy. (Dkt. 203-23). He has not pursued a writ of habeas corpus under 28 U.S.C. § 2241.

White cannot save these claims by asking, as he does, for joinder of his habeas claims to his federal and state claims. Habeas is the exclusive remedy available to federal prisoners whose claims would have at least a "probabilistic impact" upon the duration of their custody. *See Bourke v. Hawk Sawyer*, 269 F.3d 1072, 1074 (D.C. Cir. 2001); *see also Abella v. Rubino*, 63 F.3d 1063, 1066 (11th Cir. 1995) ("[D]eclaratory or injunctive relief claims which are in the nature of habeas corpus claims - i.e., claims which challenge the validity of the claimant's conviction or sentence and seek release - are simply not cognizable under ' 1983. This rule applies equally to Bivens actions."). These claims cannot be filed in the same matter, just as this case cannot be converted by judicial fiat into an action for a writ of habeas corpus. *Moore v. Pemberton*, 110 F.3d 22 (7th Cir. 1997); *Copus v. City of Edgerton*, 96 F.3d 1038 (7th Cir. 1996). The proper avenue is for White to bring these claims in a separate habeas case. Accordingly, these claims are barred by the doctrine in *Heck*, and summary judgment is **granted** to the Federal Defendants and **denied** to White as to these claims.[4]

### e.   The Rehabilitation Act Claims

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Wisconsin Community Servs., Inc. v. City of*

---

[4] White's APA claim for monetary fines is inherently tied to his habeas claim and similarly is barred under the doctrine of *Heck.*

*Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006) (quoting 29 U.S.C. § 794(a)). To prevail on his claim under § 504 of the Rehabilitation Act, White must show that: (1) he is a qualified person, (2) with a disability, and (3) he was denied access to a program or activity solely because of his disability. *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022).

However, Congress did not waive the federal government's sovereign immunity as to money damages claims under the Rehabilitation Act. *Lane v. Pena*, 518 U.S. 187, 192–97 (2006). And further, if a branch of the federal government is found to have violated the Rehabilitation Act, the remedies available to a federal prisoner-plaintiff are limited to declaratory and/or injunctive relief; money damages are not available. *Lane*, 518 U.S. at 195. But here, White has since been transferred out of Terre Haute FCI, which makes his claims for injunctive and declaratory relief moot. *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024). The Court need not explore the merits of this claim because White cannot bring claims under the Rehabilitation Act for monetary, declaratory, or injunctive relief. Accordingly, summary judgment must be **granted** to the Federal Defendants for White's claims under the Rehabilitation Act.

### f. Violation of the Little Tucker Act, Trespass to Chattels, and Wrongful Conversion Claims

The Court screened White's Amended Complaint and permitted claims that the United States and the BOP violated the Little Tucker Act, 28 U.S.C. § 1346(a)(2), when it took his property for public use without compensation in violation of US Const Amend V. (Dkt. 76 at 17). The Little Tucker confers jurisdiction on district courts for claims against the United States not exceeding $10,000. *Stewart v. Daniels*, 2015 WL 6674852, at *2 (S.D. Ind. Nov. 2, 2015). But "[t]he Little Tucker Act . . . does not confer jurisdiction over claims sounding in tort. *Id.* The Federal Defendants maintain sovereign immunity against claims for the taking of property stemming out of the Fifth Amendment. This is true whether White brings his claims under the

Little Tucker Act or if he brings these claims under the FTCA.

As mentioned, the FTCA provides for a waiver of the United States' sovereign immunity for claims arising out of torts committed by federal employees. 28 U.S.C. § 1346(b)(1). As relevant here, the FTCA authorizes "claims against the United States, for money damages . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." *Id.* The FTCA exempts from this waiver certain categories of claims. *See* §§ 2680(a)–(n). Relevant here is the exception in subsection (c), which provides that § 1346(b) shall not apply to "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer." § 2680(c).

In "*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, [216, 228] (2008) the Supreme Court held that § 2680(c) excludes from this waiver claims involving the negligent handling of detained property by law-enforcement officers, which includes prison guards." *Abdulqader v. United States*, 596 F. App'x 515, 516 (7th Cir. 2015). Thus, any claim that White was deprived of his books, magazines, or radios are barred pursuant to sovereign immunity.

And even if the Federal Defendants were not immune, White cannot establish that this was a taking under the Fifth Amendment. White alleges in his Amended Complaint that his property was "destroyed or converted to public use." (Dkt. 76 at 12–13). However, in his deposition, he affirms that although he was aware he was missing 46 books and a radio after his transfer from Terre Haute FCI, he is unsure what actually happened to his property. (Dkt. 203-1 at 131–33). And although he testified in his affidavit that he saw another inmate's property containing books later added to the CMU library after that inmate's transfer, this speculative evidence does not prove that

White's own property was converted in a similar way. (Dkt. 189-1 at 44). *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (stating non-movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)). Accordingly, summary judgment is **granted** for the Federal Defendants as to White's claims alleged under the Little Tucker Act and FTCA regarding the deprivation of his property.

### B. Claims Against Decker

Finally, White has brought an IIED claim and assault and battery claim against Decker. Decker did not respond to the summary judgment motion. The consequence is that Decker has conceded White's statement of undisputed facts. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."). The Court will not grant the motion automatically; it must still verify that the submitted evidence supports the legal claims and that no genuine issue of material fact exists.

For the reasons previously stated in this order, White has not presented sufficient evidence of emotional distress to sustain an IIED claim.

The summary judgment motion against Decker alleges assault and battery for "striking me with a closed fist." (Dkt. 201 at 2). The record reflects that Decker did indeed strike White, which would constitute harmful contact. *Jenkins v. E. St. Louis Hous. Auth.*, 863 F. Supp. 2d 785, 793 (S.D. Ill. 2012). Decker admits that he entered White's cell, threatened "that we can do it out here or we can do it in your cell. It doesn't matter," and that he struck White during the "fight" or "altercation." (Dkt. 203-2 at 35–45). Decker also testified at his deposition that he cannot recall whether White ever struck him during the altercation. And he plead guilty to battery at his DHO.

In sum, there is no genuine issue for trial as to Decker's liability to White for assault and battery. Therefore, White's motion for summary judgment on Decker's liability will be **granted in**

**part and denied in part**. White's claim against Decker will proceed to trial solely on the issue of White's damages due to the assault and battery on him by Decker.

## V.    **CONCLUSION**

For the reasons explained in this Order, the Court finds as follows:

White's Motion to strike docket 203-13 to remove all mentions of his date of birth, Dkt. [219], is **GRANTED to the extent that** this document has already been filed by the Federal Defendants under seal, and White's date of birth cannot be viewed by the general public.

White's Motion for Leave to File a Separate Statement of Material Facts, Dkt. [191], and Motion to Order Defendants to File Video, Dkt. [192], are **GRANTED to the extent** that this order provides.

White's Motions to Strike Evidence from the Record, Dkts. [211], [213], [214], [217], [219], and [220] are all **DENIED**.

The Federal Defendants' Motion for Summary Judgment, Dkt. [203], is **GRANTED in part and DENIED in part**. Summary Judgment is **denied** as to White's claim of negligence related to his placement with Decker in general population against the Federal Defendants. Summary judgment is **granted** as to all other claims.

White's Motion for Summary Judgment against the Federal Defendants, Dkt. [189], is **DENIED**.

White's Motion for Summary Judgment against Decker, Dkt. [201], is **GRANTED in part and DENIED in part**. Summary judgment is **denied** as to his IIED claim against Decker, and **granted** as to White's claim that Decker committed battery against him, and his claim for damages due to the assault and battery on him by Decker shall proceed to trial or settlement.

36

White's Motion for Leave for Plaintiff and Certain Plaintiff's Witnesses to Appear by Video Conference, Dkt. [251], is **DENIED as premature**.

Defendant Decker's Motion to Appoint Counsel, Dkt. [253], is **GRANTED** to the extent that the Court will attempt to recruit pro bono counsel to represent him through final judgment.

This case remains set for final pretrial conference on February 24, 2026, and trial on March 24, 2026. The case will proceed to trial solely on the issue of White's damages due to the assault and battery on him by Decker and White's claim of negligence related to his placement with Decker in general population against the Federal Defendants. The Court prefers that White be represented by counsel for the remainder of this action. As White has reported to the Court that he has adequate means to fund this litigation, he does not appear to qualify for the appointment of pro bono counsel. Thus, White has **through Friday, February 6, 2026**, to either secure an attorney and have his counsel file an appearance in this matter, or to file a notice stating that he intends to proceed to trial *pro se*.

The Magistrate Judge is requested to hold a settlement conference after February 6, 2026, but on or before the February 24, 2026 final pretrial conference

**SO ORDERED.**

Date: 1/23/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

37

Distribution:

WILLIAM A WHITE
13888-084
CUMBERLAND - FCI
CUMBERLAND FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 1000
CUMBERLAND, MD 21501

ROBERT KENNETH DECKER
51719-074
CUMBERLAND - FCI
CUMBERLAND FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 1000
CUMBERLAND, MD 21501

All Electronically Registered Counsel