**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| WILLIAM A WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-02405-TWP-TAB |
| | ) | |
| ROBERT KENNETH DECKER,<br>UNITED STATES OF AMERICA, | )<br>) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW,**
**AND RULING FOLLOWING BENCH TRIAL**

This matter was before the Court for a bench trial conducted on June 29, 2026, and July 16, 2026. Plaintiff William A. White ("White"), who is incarcerated in the Federal Bureau of Prisons ("BOP") and is currently housed at the United States Penitentiary Cumberland FCI in Cumberland, Maryland, sued inmate Robert K. Decker ("Decker") and the United States of America ("the United States") under state law and under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"). White alleges that, while he was housed at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), the United States negligently placed him in the same housing unit as Decker, who subsequently assaulted him. The United States moved for summary judgment on all of White's claims, and that motion was granted in part and denied in part. (Dkt. 261). White also moved for summary judgment, and that motion was denied as to his claims against the United States, and granted as to his claim that Decker committed battery against him. *Id.* The claims heard at trial were: (1) assault and battery against Decker related only to the issue of damages; and (2) negligence against the United States that arises under the FTCA, 28 U.S.C. §§ 1346(b) and 2671–80.

Bothe White and Decker are self-represented. On the first day of the bench trial, White appeared in person *pro se*, Decker was present in person *pro se,* and the United States was present by counsel Traci Cosby, Assistant United States Attorney. On the second day of the trial, White and Decker appeared *pro se*, and all parties appeared virtually. Based on its evaluation of the evidence, testimony presented at the trial, and the parties' arguments, the Court now issues the following findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

The following facts are based on the Court's credibility determinations of the parties' testimonies and the exhibits admitted into evidence. Factors the Court considered in determining the credibility of the witnesses were the demeanor and candor of the witness while testifying, the inherent plausibility of the witness's account, the consistencies and inconsistencies between the witness's present and prior statements, and the witness's bias, prejudice, or other reason to lie or slant the testimony.

### A. The Parties

This case concerns an assault on White that occurred on February 18, 2022. White has been a federal prisoner in the BOP for eighteen years, and he has been cited for fighting only five times. (Dkt. 390 at 50–51). At the time of the assault, White was housed within the FCI Terre Haute Communications Management Unit ("CMU") in Terre Haute, Indiana. (Dkt. 389 at 40). The CMU is an intelligence unit within FCI Terre Haute used to house inmates who are involved in political or religious cases or have misconduct related to communications outside the prison. *Id.* at 20. White was held in the CMU for about seven years, and during that time observed and became

[1] To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

familiar with the operations, practices, and procedures of the CMU. *Id.* at 20. Decker was also a federal inmate categorized to be confined to the CMU. *Id.* at 117.

At the time of the relevant events, there were only two CMUs in the United States, one in Terre Haute, Indiana, at FCI Terre Haute, and one at the United States Penitentiary in Marion, Illinois ("USP Marion"). *Id.* at 201–14. During the relevant time, the CMU at FCI Terre Haute housed approximately 60–64 inmates, and the CMU at USP Marion housed approximately 30 inmates. *Id.* at 211, 252. Quite frequently, this small number of inmates might be transferred between the two CMU prisons. *Id.* at 201. In a CMU, the inmates are subject to complete communications monitoring to include monitoring of the inmates' postal mail, email, and telephone calls. *Id.* at 198. Mail is screened not for content, but for potential threats such as threats to the government, threats to the president or witnesses, possible drug interdictions, as well as falsification of court documents. *Id.* at 198–99. Housing assignments, such as an assignment to the CMU, were made by the Counter-Terrorism Unit at the BOP. *Id.* at 199–200.

**B. Events Prior to the Incident**

In 2018, White met Decker at USP Marion, where both inmates were housed together within the CMU for approximately eight months. *Id.* at 19–20, 36. While at USP Marion, Decker attempted to befriend White, and in turn, White assisted Decker with some legal work. *Id.* at 20–22. Eventually, White stopped assisting Decker with legal matters because he believed that Decker had lied under oath and attempted to have White prepare a false declaration for one of Decker's legal proceedings. *Id.* at 31–32. White told Decker that he would no longer assist him with his legal work, and White wrote to the Assistant United States Attorney who was representing the United States in Decker's civil case, and explained that he would no longer assist Decker because he believed that Decker was setting him up to commit a crime. (Dkt. 405 at 13). The two remained

in the same housing population in the USP Marion CMU until February 2019 when Decker was transferred to another institution. (Dkt. 389 at 19–20).

On October 13, 2021, White was involved in an altercation with another inmate in the USP Marion's general population CMU, which resulted in White being placed in the USP Marion CMU's Special Housing Unit ("SHU"). *Id.* at 39. Inmates could be transferred from one CMU to another for various reasons including fighting. *Id.* at 201–02. Shortly thereafter, in January of 2022, White was transferred to the CMU at FCI Terre Haute. *Id.* at 236.

**C. Transfer to the Terre Haute CMU**

Upon his arrival in the CMU at FCI Terre Haute, White was housed in the SHU for initial intake and screening. *Id.* at 229–30. White knew upon his arrival at FCI Terre Haute that Decker was housed in the FCI Terre Haute CMU general population. *Id.* at 65.

Todd Royer, Camp Administrator at FCI Terre Haute, was the unit manager for the CMU in early 2022. (Dkt. 390 at 15–16). He testified that to his knowledge, when White was transferred from USP Marion CMU to FCI Terre Haute CMU in January 2022, no one at FCI Terre Haute CMU was made aware of any potential conflicts between White and Decker. *Id.* at 24.

Jamie Wheeler ("Wheeler") was serving as the Acting Intelligence Research Specialist at the FCI Terre Haute CMU. (Dkt. 389 at 197). Wheeler would prepare for a prisoner's arrival by reviewing the individual's previous charges or what got him incarcerated, his conduct while in prison, and then the current conduct that landed him in a position in the CMU. *Id.* at 200. She would also look into SENTRY, which is a database that would state whether an inmate had a separation at FCI Terre Haute prison or any other prison. *Id.* at 200–01. In January 2022, Wheeler conducted White's intake assessment. *Id.* at 197, 237. During White's assessment, Wheeler asked

him if he had any safety concerns about being released to the CMU general population. *Id.* at 230. White expressed no specific fears or concerns. *Id.* at 237. [2]

Shortly after, White also received an intake for psychological services by a BOP psychiatrist, Dr. Sheridan, to determine the appropriate level of care, and in that intake, he also failed to express any concerns about his safety. *Id.* at 323. Dr. Sheridan did not review White's clinical intervention clinical contact documents, but she did engage in a prolonged discussion with White. *Id.* at 332–33. White's intake report references the fact that he has previously been diagnosed with posttraumatic stress disorder. *Id.* at 333. Following the assessment, White was released to the CMU general population on February 8, 2022. (Trial Exhibit 202 at USA00143). From February 8, 2022, until the assault, Wheeler did not observe any issues or unusual behavior between Decker and White. (Dkt. 389 at 240–41). White never told Wheeler or Dr. Sheridan that he should not be housed with Decker. *Id.* at 97–98.

While at USP Marion, Decker never made any threats to harm White. *Id.* at 178–79. Prior to White's arrival at the FCI Terre Haute CMU, Decker told Lt. Sherman that there "would be a problem" if the two were housed together. *Id.* at 149. Decker testified that by this statement, he meant that he believed White would sabotage Decker's character. *Id.* He does not recall ever speaking to Wheeler about any issues with White. *Id.* at 149–50. Further, Decker never told Wheeler or BOP Officer Lt. Sherman that he would harm White if both of them were to be transferred to FCI Terre Haute. *Id.* at 177–78.

Most inmates housed within the two CMUs were familiar with each other because they were sequestered with each other "24/7." *Id.* at 230–31. Given their constant and close proximity

[2] Although White contends that Wheeler never conducted his intake interview and that instead, Rebekka Eisele conducted his intake, he admits that whether his intake interview was with Wheeler or Eisele is immaterial because "I also didn't express concern[s regarding Decker] to Eisele." *Id.*

to one another, inmates within the CMU frequently expressed displeasure with other CMU inmates and had heated arguments with each other. *Id.*

Before the assault, Decker and White did not have any sort of separatee designation[3] in their files that would prohibit the two from being housed in the same unit. *Id.* 221–38. White and Decker had never previously been involved in any sort of physical altercation at USP Marion or at FCI Terre Haute prior to February 18, 2022. *Id.* at 98.

**D. The Assault**

On February 18, 2022, at approximately 9:00 PM, White was sitting in his cell reading a book. *Id.* at 69. Decker opened his cell door and stated, "[y]ou better get . . . my name out of your mouth." *Id.* In response. White stood up and told Decker that if he was not going to fight him, then he should "get the fuck out of [his] cell." *Id.* at 70. Decker began to back out of the cell and continued to shout at White. *Id.* at 71. Once outside of White's cell, the two continued shouting back and forth in the hallway. (Trial Exhibit 7 at 18:35). Decker then struck White on the left side of White's face with his right fist. (Dkt. 389 at 71–72).

When Decker hit White, he knocked White's glasses askew, and White began laughing. *Id.* at 72. White was not physically injured by Decker striking him. *Id.* White testified that he barely felt that Decker had punched him because Decker was "not strong enough" to harm him. *Id.* After punching White, Decker ran away from White's cell. *Id.* at 171. White followed after Decker, laughing and saying, "What are you doing? Come over here." *Id.* at 73. White walked after Decker because "he was acting ridiculous. And at this point, he--I mean--I wasn't in any danger, so I was just having some fun with him." *Id.* Decker then ran at White with all his might and attempted to

[3] A separate or separatee designation in the Federal Bureau of Prisons typically refers to an administrative or security classification—such as a Central Inmate Monitoring (CIM) assignment or a "keep separate" / separation need—used to isolate specific inmates from one another for safety, protection, or case management. https://www.bop.gov/inmates/custody_and_care/designations.jsp

push White over, and White and Decker continued pushing each other in the hallway with open hands. *Id.* at 73–74. Eventually, Decker again attempted to run away, and White followed after him while continuing to laugh. *Id.* at 74–75. When they got to the end of the hall, Decker turned towards White like he was going to lunge at White again, but Decker ran away for a third time. *Id.* at 75.

Correctional Officer Emerson approached while White and Decker were shoving each other and instructed the two men to "break it up." *Id.* at 171. White did not hear the command. *Id.* at 73. When the two did not comply, Officer Calloway dispersed oleoresin capsicum spray ("OC spray") towards both men. *Id.* at 172–73. White testified that while he was standing there confused, he turned his head towards Officer Calloway, and Officer Calloway unloaded a can of OC spray in White's face *Id.* at 75. White was hit directly in the face by the spray, but Decker had run farther down the tier and was not hit by the spray. *Id.* at 75, 173.

White was then handcuffed and taken to be decontaminated from the OC spray. *Id.* at 76–77. After decontamination, he was immediately reassigned to the CMU SHU. (Dkt. 390 at 411). White remained in the CMU SHU until July 22, 2022, when he was transferred to the Federal Correctional Institution in Cumberland, Maryland. *Id.* at 88.

Following the assault, Decker was also transferred to the CMU SHU; however, the two had no further direct contact with each other while housed in FCI Terre Haute. *Id.* at 81–82, 100.

**E. Decker's Testimony**

Decker does not dispute that he entered White's cell and assaulted White. He admits that he told Lt. Sherman that there would be a "problem" if they moved White to Terre Haute. *Id.* at 149. But Decker never told Lt. Sherman that he was going to hurt White if White moved to Terre Haute. *Id.* at 177. February 18, 2022, was the first time that Decker was involved in a physical altercation with White. *Id.* Decker testified that he never directly threatened to physically hurt

White before the February 18 assault. *Id.* at 178–79. And even while they were at USP Marion, Decker never made any threats to physically harm White. *Id.* at 178.

## II. CONCLUSIONS OF LAW

White's claims at trial were: (1) an Indiana state-law assault and battery claim against Decker on the issue of damages; and (2) a negligence claim against the United States that arises under the FTCA, 28 U.S.C. §§ 1346(b) and 2671–80. He seeks damages for the physical injury caused by the OC spray, and for his mental or emotional injury "without a prior showing of physical injury." (Dkt. 405 at 36). White cites 28 U.S.C. § 1346(b)(2) and points out that the Seventh Circuit has found that, as long as the underlying tort causes a physical injury, mental and emotional injury proceeding from the tort and not directly from the physical injury fall within the scope of permissible damages. *See, e.g.*, *Rasho v Elyea*, 856 F.3d 469 (7th Cir. 2017).

White argues the Court should find the United States responsible for Decker's battery upon him, and thus the United States is also 40% responsible for Calloway's use of OC spray against him and his subsequent SHU confinement. (Dkt. 405 at 36). He asserts that Calloway's use of OC spray against him caused him $2,000.00 in compensatory damages, of which the United States is liable for $800.00. *Id.* He seeks $50,000.00 in compensatory damages for the SHU confinement from February 18, 2022 to July 22, 2022, of which the United States is liable for $20,000.00. *Id.* White does not request a specific dollar amount in damages from Decker for the February 18, 2022 assault.

### A. Damages Related to the Assault with Decker

Under Indiana law, a defendant commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or

indirectly results." *Singh v. Lyday*, 889 N.E.2d 342, 360 (Ind. Ct. App. 2008) (quoting *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007)). An assault occurs "when one acts intending to cause a harmful or offensive contact with the person of the other or an imminent apprehension of such contact." *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind. 1991) (citing Restatement (Second) of Torts § 21 (1965)).

Because assault and battery are intentional torts, the defendant is only liable if he acted recklessly or with reckless disregard of the consequences. *Turner v. Sheriff of Marion Cnty.*, 94 F. Supp. 2d 966, 994 (S.D. Ind. 2000). A plaintiff must prove the elements by a preponderance of the evidence. *United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir. 1992) (noting that the preponderance of the evidence standard is "the normal standard in civil cases").

As the Court previously noted at summary judgment, there was no genuine issue for trial as to Decker's liability as to White for assault and battery, and the Court only heard testimony at the trial regarding damages. *Jenkins v. E. St. Louis Hous. Auth.*, 863 F. Supp. 2d 785, 793 (S.D. Ill. 2012). At trial, White testified at length that after the argument within his cell, he continued to pursue Decker until Decker struck him a single time with a closed fist, and even after the strike, White followed after Decker through the hall. *Id.* at 69–75. White testified that he was completely unharmed after the assault because Decker was not strong enough to truly harm him. *Id.* at 72. As noted above, White does not request a dollar amount for any physical damages caused by Decker's assault; rather, he seeks to recover emotional distress damages related to the officer's use of OC spray and his time in the SHU. (Dkt. 405 at 35–36).

Under Indiana's Comparative Fault Act, a plaintiff is barred from recovery if their contributory fault is greater than the fault of the defendant. Ind. Code § 34-51-2-5. Under Indiana law, "[c]ontributory negligence is conduct on the part of the plaintiff, contributing as a legal cause

to the harm the plaintiff has suffered, which falls below the standard to which the plaintiff is required to conform for his or her own protection." *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 239 (Ind. Ct. App. 2001).

Had White been hurt by Decker's initial strike, he could have recovered damages from him. But White admits that punch caused him no harm. Thus, the Court must decide whether Decker bore any responsibility for the actions that happened once White pursued Decker down the hall and continued to fight with him. When assessing causation, the Court turns to general causation principals from tort law. *Hunter v. Mueske*, 73 F.4th 561, 568 (7th Cir. 2023) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012)). In order to constitute a bar to recovery, contributory fault must be a proximate cause of the injury. *Harris v. Cacdac*, 512 N.E.2d 1138, 1139–40 (Ind. Ct. App. 1987). The contributory fault must unite in producing the injury and, thus, be "simultaneous and co-operating with the fault of the defendant . . . (and) enter into the creation of the cause of action." *Id.*

That is the case here. White's continued laughter, taunts, and pursuit of Decker down the hall where the two engaged in a shoving match were all contributory to the eventual harm he suffered: emotional damages from OC spray and segregation within the SHU. White's participation in the fight breaks the causal chain that would have allowed any recovery of damages from Decker. *Tole v. Sanchez*, No. 25-CV-02578, 2026 WL 2096541, at *3 (S.D. Ind. July 21, 2026); *Hunter*, 73 F.4th at 569 (noting that plaintiff's "injury was caused . . . by his own decision to place himself in harm's way"). The Court finds that White is not entitled to damages against Decker.

**B. Negligence Claim Against the United States**

The FTCA is a limited waiver of the United States' sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of

negligence of government employees. *United States v. Muniz*, 374 U.S. 150 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b). For a claim proceeding under the FTCA, Indiana substantive law applies. *Id.* § 1346(b)(1); *see also Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred.").

To state a claim for negligence under Indiana law, White must allege that the United States owed a duty to him, it breached that duty, and the breach caused White's injuries. *Looney v. Nestle Waters N. Am., Inc.*, 187 N.E.3d 867, 872 (Ind. Ct. App. 2022). The parties agree that the United States owed a duty to White, so the Court proceeds to the second and third elements. White must show a breach by showing that BOP staff knew or reasonably should have known of a potential problem between him and Decker. *Parrott v. United States*, 536 F.3d 629, 636–37 (7th Cir. 2008).

White bases his negligence claim against the United States on two alleged negligent acts: (1) the United States had or should have had knowledge of potential tension between White and Decker because of a letter penned by White involving Decker, which was read by the CMU unit staff as part of their security measures, and (2) Decker had previously stated to BOP staff there would be "problems" if the two were housed together at FCI Terre Haute. (Dkt. 405 at 34–36).

White has not shown that the United States breached any such duty to him. Although White and Decker had had a falling out while they were both housed at USP Marion, Decker testified that he never directly threatened to physically hurt White before the February 18 attack. (Dkt. 389 at 178–79). White admits that the two never physically fought at USP Marion, and Wheeler

testified that BOP did not have any separatee designation in their files that would require separation between the two inmates. *Id.* at 95, 221, 238. White argues that his letter to an AUSA should have triggered a threat assessment to create a separatee designation prior to White's arrival at the FCI Terre Haute CMU.

The Court credits both Todd Royer and Jamie Wheeler's testimony that no one at FCI Terre Haute had any reason to believe that there were any potential conflicts between White and Decker when White was transferred from USP Marion to FCI Terre Haute in January 2022. (Dkt. 390 at 24, Dkt. 389 at 216–17). The Court further credits White's own testimony that during two separate intakes after his transfer, he never requested separation from Decker despite specific inquiries from BOP staff regarding concerns about his safety. (Dkt. 389 at 273, 285).

As to White's second argument, the Court finds credible Decker's testimony that he told Lt. Sherman that there would be a "problem" if the two were housed together but never threatened assault. White admits that Decker never directly threatened to physically hurt him while they were housed together at USP Marion CMU, and never threatened to physically hurt him after he arrived at FCI Terre Haute before he was released into the CMU general population. During the relevant time, the CMU at FCI Terre Haute housed approximately 60–64 inmates, and the CMU at USP Marion housed approximately 30 inmates. Due to the small number of inmates within the CMU, the frequency of conflicts among this group of inmates, and the absence of any explicit requests from either inmate for reassignment, the Court finds that BOP staff did not breach any duty by not ordering a threat assessment or taking other proactive measures to separate the two inmates. Accordingly, the Court finds that the United States was not negligent in the decision to place White with Decker in the CMU general population.

## III. RULING

Based upon the foregoing findings of fact and conclusions of law, the Court concludes that White incurred no injury from the assault, so he recovers no damages for the assault from Decker. White was contributorily at fault for the altercation with Decker following the assault, and therefore he is not entitled to damages on his assault and battery claim.

The Court finds that the United States was not negligent in placing White and Decker together in the CMU general population prior to the assault by Decker. The United States is entitled to judgment on this FTCA negligence claim. Because White has failed to establish by a preponderance of the evidence that he was subjected to negligence, the Court need not consider the issue of damages on this claim.

Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Dated: 9/29/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

WILLIAM A WHITE
13888-084
CUMBERLAND - FCI
CUMBERLAND FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 1000
CUMBERLAND, MD 21501

ROBERT KENNETH DECKER
51719-074
CUMBERLAND - FCI
CUMBERLAND FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 1000
CUMBERLAND, MD 21501

All Electronically Registered Counsel